# EXHIBIT D

LEXSEE



Caution
As of: Oct 28, 2007

APPLIED INTERACT, LLC, Plaintiff, - v- THE VERMONT TEDDY BEAR COMPANY, INC. Defendant.

04 Civ. 8713 (HB)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2005 U.S. Dist. LEXIS 19070

September 6, 2005, Decided
September 6, 2005, Filed

**PRIOR HISTORY:** Applied Interact, LLC v. Vt. Teddy Bear Co., 2005 U.S. Dist. LEXIS 15016 (S.D.N.Y., July 24, 2005)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patent licensee sued defendant seller for patent infringement under 35 U.S.C.S. § 271. The seller moved for summary judgment of non-infringement.

**OVERVIEW:** The licensee held four patents relating to methods of communication between an "organizer" and audience members in remote locations. The licensee alleged that the seller infringed the patents by offering through its Internet web site a coupon for a free factory tour, by enabling customers to search for product information, and by inviting customers to sign up for a membership and be entered in a sweepstakes. The court found that the seller could be liable for direct infringement if customers with whom the seller had some connection performed steps of the patent claims. There were fact issues as to whether the seller infringed one patent by "programming" computer systems and printers "provided" by customers to print out the coupon. Customers' use of their systems to search the site raised fact issues as to infringement of a second patent. The use of the term "wager" in a third patent precluded a finding of infringement as to the sweepstakes, as customers' entry of personal information did not constitute a wager. As for the fourth patent, there were triable issues that the seller and its customers provided a means for communicating response data to a central storage facility.

**OUTCOME:** The seller's motion for summary judgment of non-infringement was granted as to one of the patents and was denied as to the other three.

**CORE TERMS:** customer's, coupon, infringement, patent, web, summary judgment, token, internet, wager, player's, signals, print, site, programming, hardware, factory, remote, dispenser, indicium, non-infringement, sweepstakes, printer, entity, javascript, genuine, personal information, specification, responding, dictionary, stimulus

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN1]A court will not grant a motion for summary judgment unless it determines that there is no genuine issue of material fact and the undisputed facts are sufficient to warrant judgment as a matter of law. Fed. R. Civ. P. 56.

*Civil Procedure > Summary Judgment > Standards > General Overview*

*Patent Law > Infringement Actions > Summary Judgment > General Overview*
[HN2]The standard for summary judgment is no different in patent infringement cases than in any other case.

*Civil Procedure > Summary Judgment > Appellate Review > General Overview*
*Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview*
*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN3]Pursuant to Fed. R. Civ. P. 56(c), a court must review the evidence in support of a motion for summary judgment in a light most favorable to the non-movant. The court must also draw all inferences in the non-movant's favor. Summary judgment is thus inappropriate if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party.

*Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview*
*Civil Procedure > Summary Judgment > Opposition > General Overview*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
[HN4]Upon a summary judgment motion, while the burden to demonstrate that there is no genuine issue of material fact rests solely with the moving party, once the moving party has provided sufficient evidence to support a motion for summary judgment, the opposing party must set forth specific facts showing that there is a genuine issue for trial and cannot rest on mere allegations or denials. Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence supporting the non-movant's case is insufficient to defeat a motion for summary judgment. An opponent must do more than simply show that there is some metaphysical doubt as to the material facts.

*Patent Law > Infringement Actions > Infringing Acts > Use*
[HN5]See 35 U.S.C.S. § 271(a).

*Patent Law > Infringement Actions > Infringing Acts > General Overview*
[HN6]Several district courts have found a party liable for direct infringement under 35 U.S.C.S. § 271(a) when it performed only some steps of a method claim, and other entities performed the other steps. There must, however, be "some connection" between the party and the other entities. Further, direct infringement is not applicable to an entity that performs one step of a patented process, and then sells the resulting product to another entity that performs the remaining steps. Thus, when a party arranges for another entity to carry out part of the patented method and then completes the process itself, it is held responsible for the other party's infringing acts by virtue of its connection with the other entity. The rationale for finding liability in these circumstances is that a party may not avoid direct infringement by having someone else perform one or more steps of the patented method for it.

*Patent Law > Infringement Actions > Infringing Acts > Intent & Knowledge*
[HN7]It is well-settled that knowledge and intent are not elements of direct infringement; hence, direct infringement may be innocent.

*Patent Law > Infringement Actions > Infringing Acts > General Overview*
[HN8]Cases appear to suggest the proposition that direct patent infringement may be sustained when a method claim is performed by connected entities and particularly where the patent contemplates action by at least two actors.

*Patent Law > Infringement Actions > Claim Interpretation > Scope*
[HN9]The first step of a literal patent infringement analysis is to construe the meaning and scope of the patent claims asserted to be infringed. The second step is to compare the properly construed claims to the products accused of infringing.

*Patent Law > Infringement Actions > Claim Interpretation > Fact & Law Issues*
[HN10]Patent claim construction is a matter of law; but infringement is a question of fact.

*Patent Law > Claims & Specifications > Enablement Requirement > General Overview*
*Patent Law > Infringement Actions > Claim Interpretation > Aids*
*Patent Law > Infringement Actions > Claim Interpretation > Construction Preferences*
[HN11]Patent claim construction begins with the language of the claim itself, which is to be read and understood as it would be by a person of ordinary skill in the art at the time of the invention. In construing the claims, the court must at least in the first instance examine the intrinsic evidence (e.g., the patent, its claims, the specifi-

cation, and file history) and then, if necessary, extrinsic evidence (e.g., expert reports, testimony, and anything else).

*Patent Law > Infringement Actions > Claim Interpretation > Aids*
*Patent Law > Infringement Actions > Claim Interpretation > Construction Preferences*
[HN12]Generally, the terms in a patent claim should be given their ordinary and accustomed meaning. Dictionaries, encyclopedias, and treatises are particularly useful to assist the court in determining the ordinary and customary meanings of claim terms. The definition of a claim term may be altered from its ordinary and accustomed meaning, however, if "clearly and deliberately" set forth in the intrinsic evidence, such as the written description and prosecution history.

*Patent Law > Infringement Actions > Infringing Acts > General Overview*
[HN13]To establish literal infringement, every limitation set forth in a patent claim must be found in an accused product or process exactly or by a substantial equivalent. When the claim at issue involves a method or process, infringement does not occur unless all steps or stages of the claimed method are performed.

*Patent Law > Infringement Actions > Claim Interpretation > Aids*
[HN14]Where a patent does not explicitly define the meaning of a claim term, and neither party argues that the term has an established specialized meaning in technical dictionaries, encyclopedias, or treatises of the relevant field of art, a standard English dictionary is a proper resource to understand the ordinary and accustomed meaning of the term.

*Patent Law > Claims & Specifications > Description Requirement > General Overview*
*Patent Law > Infringement Actions > Claim Interpretation > Means Plus Function*
[HN15]A means-plus-function patent claim is one expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof. 35 U.S.C.S. § 112, para. 6. To construe a means-plus-function limitation, the court first identifies the function of that limitation, then identifies the corresponding structure(s) in the specification necessary to perform that function.

*Patent Law > Claims & Specifications > Description Requirement > General Overview*
*Patent Law > Infringement Actions > Claim Interpretation > Means Plus Function*
*Patent Law > Infringement Actions > Infringing Acts > General Overview*
[HN16]Infringement of a means-plus-function limitation in a patent occurs when an accused device performs the identical function specified in the means clause and is insubstantially different from the corresponding structure. In sum, for a means-plus-function limitation to read on an accused device, the accused device must employ means identical to or equivalent of the structures, material, or acts described in the patent specification. The accused device must also perform the identical function as specified in the claims.

COUNSEL: [*1] For Applied Interact, LLC, Plaintiff: John Flock, Paul Thomas Qualey, Richard S. Gresalfi, Kenyon & Kenyon, New York, NY.

For The Vermont Teddy Bear Co., Inc., Defendant: H. Jay Spiegel, H. Jay Spiegel & Associates, Mount Vernon, VA; Michael A. Adler, Gibbons Del Deo, Dolan, Griffinger & Vecchione (NY), New York, NY.

For The Vermont Teddy Bear Co., Inc., Counter Claimant: H. Jay Spiegel, H. Jay Spiegel & Associates, Mount Vernon, VA; Michael A. Adler, Gibbons Del Deo, Dolan, Griffinger & Vecchione (NY), New York, NY.

For The Vermont Teddy Bear Co., Inc., Counter Defendant: H. Jay Spiegel, H. Jay Spiegel & Associates, Mount Vernon, VA; Michael A. Adler, Gibbons Del Deo, Dolan, Griffinger & Vecchione (NY), New York, NY.

For Applied Interact, LLC, Counter Defendant: Shirley Othmana Saed, Kenyon & Kenyon, New York, NY.

JUDGES: Hon. HAROLD BAER, JR., District Judge *:

> * Chris Straw, a Fall 2005 intern in my Chambers, and currently a second year law student at New York University School of Law, provided substantial assistance in the research and drafting of this Opinion.

OPINION BY: HAROLD BAER, JR.

OPINION

*OPINION & ORDER*

Hon. HAROLD BAER, JR., District Judge [*2] *:

On November 4, 2004, Plaintiff, Applied Interact, LLC ("AI"), filed the instant action against Defendant, The Vermont Teddy Bear Company, Inc. ("VTB"). The complaint alleges, *inter alia*, that VTB infringed certain patents currently licensed to AI. Presently before the Court is a motion by VTB for summary judgment of non-infringement pursuant to Rule 56 of the Federal Rules of Civil Procedure. Oral argument was held on August 30, 2005 and this motion is now *sub judice*. For the reasons set forth below, VTB's motion is GRANTED in part and DENIED in part.

## I. BACKGROUND

### A. *Factual Overview*

AI is the exclusive licensee of United States Patent Nos. 5,227,874 (issued July 13, 1993) ("the '874 patent"); 5,249,044 (issued Sept. 28, 1993) ("the '044 patent"); 5,508,731 (issued Apr. 16, 1996) ("the '731 patent"); and 5,713,795 (issued Feb. 3, 1998) ("the '795 patent) (the "patents-in-suit") (Am. Compl. PP 8-11). [1] All four patents relate to methods of communication between an "organizer" and audience members in remote locations. The patents contemplate that the organizer will broadcast certain stimuli, such as [*3] product advertisements or sweepstakes; that audience members will respond to the stimuli from remote locations and be able to generate product coupons at those remote locations; and that the organizer will evaluate the individual responses. *See* Abstracts of '874, '044, '731, '795 patents.

> 1   The court assumes familiarity with the background facts relating to the license as set forth in *Applied Interact, LLC v. The Vt. Teddy Bear Company, Inc.*, 2005 U.S. Dist. LEXIS 15016, 04 Civ. 8713, 2005 WL 1785115 (S.D.N.Y. July 28, 2005) (denying defendant's motion for summary judgment on lack of standing).

VTB, like everyone else, hosts a web site on the Internet containing information about its products. Through its web site, VTB offers visitors a coupon for a free tour of its factory. *See* Print-out of Factory Tour Coupon Web Page ("Coupon"), Ex. 1 to 07/01/05 Declaration of Paul T. Qualey, counsel for AI ("Qualey Decl."). VTB's web site allows visitors to search for information about products that VTB sells online. [*4] *See* Print-out of First Product Search Web Page ("Product Search 1"), Ex. 4 to Qualey Decl. VTB also invites its web site visitors to sign up to be "PrefUR'd" members and be entered in its sweepstakes to win a free teddy bear. *See* Print-out of Membership Invitation Web Page ("Membership Invitation"), Ex. 6 to Qualey Decl. AI contends that when VTB communicates with its customers through these online features, VTB and its customers perform certain actions that infringe the patents-in-suit. *See* 07/01/05 Plaintiff's Opposition to Defendant's Motion for Summary Judgment of Non-Infringement (Pl. Opp'n) at 1. AI also contends that VTB induces its customers to perform the allegedly infringing acts. *See id.*

### B. *Procedural History*

On February 11, 2005, AI filed an Amended Complaint charging VTB with infringement of the '874 and '044 patents. Am. Compl. PP 20, 22. AI also charges VTB with willful and deliberate infringement of the '731 and '795 patents, alleging that VTB's infringement of these patents continued after VTB was given written notice of infringement. Am. Compl. PP 13-14, 17-18. AI requests *inter alia*, a permanent injunction, reasonable attorney [*5] fees, expenses and costs, treble damages for willful infringement of the '731 and '795 patents, and damages in accordance with 35 U.S.C. § 281. (Am. Compl., Prayer for Relief). On June 9, 2005, VTB filed a motion for summary judgment on the grounds that AI lacked standing to institute this lawsuit. On July 28, 2005, this Court denied the motion.

## II. LEGAL STANDARD FOR SUMMARY JUDGMENT

[HN1]A court will not grant a motion for summary judgment unless it determines that there is no genuine issue of material fact and the undisputed facts are sufficient to warrant judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). [HN2]The standard for summary judgment is no different in patent infringement cases than in any other case. *See TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1369 (Fed. Cir. 2002) (same summary judgment standard applied to non-infringement).

[HN3]Pursuant to Rule 56(c), I must review the evidence in support of VTB's motion [*6] for summary judgment in a light most favorable to the non-movant. *Anderson*, 477 U.S. at 255. I must also draw all inferences in the non-movant's favor. *See Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir. 2000). Summary judgment is thus inappropriate "if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citing *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000)).

[HN4]While the burden to demonstrate that there is no genuine issue of material fact rests solely with the moving party, *FDIC v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994), once the moving party has provided sufficient evidence to support a motion for summary judgment, the

opposing party must "set forth specific facts showing that there is a genuine issue for trial" and cannot rest on "mere allegations or denials." Rule 56(e); see Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994). The "mere existence of a scintilla of evidence" supporting the non-movant's [*7] case is insufficient to defeat a motion for summary judgment. Anderson, 477 U.S. at 252. An "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).

### III. THE DISPUTED CLAIMS

#### A. The '874 Patent

The '874 patent is directed to methods for the evaluation of stimuli intended to promote purchases by shoppers. AI contends that Claim 10 of the '874 patent is infringed by VTB. That claim reads:

> A method for evaluating the inducement effect of a stimulus on individuals comprising the steps of:
>
> an organizer exposing individuals to a stimulus intended to induce the performance of a desired act by said individuals,
>
> providing said individuals with electronically programmable token dispensers capable,
>
> upon the request of individual ones of said individuals, of dispensing a token having value to said requesting individual, said value being available upon the performance of said act and upon surrender of said token,
>
> programming said dispensers by means of electronic instructional signals [*8] transmitted from a central location, said programming including value information to be borne by said token, said step of programming occurring subsequent to exposure of individuals to said stimulus, and prior to an individual requesting the dispensing of a token through entry of a command in said dispenser,
>
> dispensing to each of said requesting individuals a token bearing said value information,
>
> performing the desired act by at least some of said individuals having tokens,
>
> said token surrendering individuals surrendering said tokens to said organizer,
>
> said token surrendering individuals receiving said value, and
>
> said organizer measuring the inducement effect of said stimulus on individuals by evaluating the performance of the desired act by said individuals as evidenced by surrendered tokens.

#### B. The '044 Patent

The '044 patent is directed to a system for generating product coupons at remote locations. Here AI contends that VTB has infringed Claim 25 of the '044 patent that reads:

> A method of recording and displaying information signals comprising steps of:
>
> providing a system at a remote location for recording product information signals conveyed over [*9] a telephone line and, for displaying the signals on a television at the remote location;
>
> a person, at the remote location, contacting a central location by means of a telephone and entering a code;
>
> transmitting product information signals from the central location to the remote location over telephone wires in response to entering of the code;
>
> recording the transmitted product information signals at the remote location on the system; and displaying the recorded signals on the television at the remote location.

#### C. The '731 Patent

The '731 patent is directed to a system and method for wagering and enlisting responses to broadcast programs. AI contends that VTB has infringed Claim 62 of the '731 patent. That claim reads:

> A method for encouraging participation in surveys or polls comprising the steps of:
>
> transmitting electronic signals eliciting responses to questions from a central facility to members of an audience to be polled;
>
> receiving elicitations at locations of said members;
>
> providing means for entering a response to individual ones of said members;
>
> entering responses by individual ones of said members;
>
> providing means for communicating response [*10] data from the locations of responding members to a central data storage facility;
>
> communicating said response data to said central facility;
>
> storing members' response data at said central facility;
>
> providing means at said central facility for identifying the responding members;
>
> entering responding members in a sweepstakes;
>
> conducting said sweepstakes to determine at least one winning responding member; and
>
> informing winning members about a result of said sweepstakes.

### D. The '795 Patent

The '795 patent, like the '731 patent, is directed to a system and method for wagering and enlisting responses to broadcast programs. AI contends that this patent too is infringed by VTB. Claim 26 of the '795 patent reads:

> A method for conducting a contest, including games and wagers, by a plurality of players at locations remote from a central location, comprising steps of:
>
> providing a program of presentation of indicia to players of the contest;
>
> establishing response criteria for judging responses of the players;
>
> introducing a mode of scoring of the responses of the players independently of the program providing step;
>
> making known a winning indicium of said [*11] indicia by a wager operator;
>
> comparing the winning indicium with a selected indicium of a player's wager entry in accordance with said response criteria and said scoring criteria, wherein, upon the occurrence of a determined correlation of the player's wager entry indicium to the winning indicium, the player's wager entry indicium is deemed to be a winning wager;
>
> storing an identification of a player and the player's wager entry indicium at a tamper-resisting storage facility; and
>
> authenticating the indicium of the player's wager entry indicium by reference to the player's stored identification and the player's stored wager entry indicium.

## IV. DISCUSSION

### A. *Theory of Liability*

VTB contends that it is not liable for infringement because it does not perform one or more steps of the disputed method claims. *See* 06/17/05 Defendant's Memorandum of Law in Support of Motion for Summary Judgment of Non-Infringement ("Def. Mem.") at 12, 14, 18, 21. Further, VTB maintains that it has no connection with its customers when they independently perform certain steps of the claims. *See id.* at 13, 15, 18.

AI argues that VTB has a direct relationship with [*12] its customers because it offers its online coupon,

product search functionality, and sweepstakes sign-up to attract consumers to obtain information about VTB and to purchase its products. See Pl. Opp'n at 9, 13, 17. Moreover, AI asserts that VTB's offers and the design of VTB's web site induce its customers to perform certain steps of the claims. See id. at 6-7, 11, 17.

The pivotal statute here, as in all infringement cases, is 35 U.S.C. Section 271(a). It reads in pertinent part: [HN5]"Except as otherwise provided in this title, whoever without authority . . . uses . . . any patented invention, within the United States . . . during the term of the patent therefor, infringes the patent." Id. (2000). [HN6]Several district courts have found a party liable for direct infringement under Section 271(a) when it performed only some steps of a method claim, and other entities performed the other steps. Marley Mouldings Ltd. v. Mikron Indus., Inc., 2003 U.S. Dist. LEXIS 7211, No. 02 C 2855, 2003 WL 1989640, at *2 (N.D. Ill. Apr. 30, 2003) (collecting cases). There must, however, be "some connection" between the party and the other entities. Id. (citing Faroudja Labs., Inc. v. Dwin Elecs., Inc., 1999 U.S. Dist. LEXIS 22987, No. 97 Civ. 20010, 1999 WL 111788, at *5 (N.D. Cal. Feb. 24, 1999)). [*13] Further, direct infringement is not applicable to an entity that performs one step of a patented process, and then sells the resulting product to another entity that performs the remaining steps. Id. (citing E.I. Dupont de Nemours & Co. v. Monsanto Co., 903 F. Supp. 680, 735 (D. Del. 1995)). Thus, when a party arranges for another entity to carry out part of the patented method and then completes the process itself, it is held responsible for the other party's infringing acts by virtue of its connection with the other entity. See id. at *3. The rationale for finding liability in these circumstances is that a party may not avoid direct infringement by having someone else perform one or more steps of the patented method for it. See id. [HN7]It is well-settled that knowledge and intent are not elements of direct infringement; hence, direct infringement may be innocent. See Intel Corp. v. U.S. Int'l Trade Comm'n, 946 F.2d 821, 832 (Fed. Cir. 1991); Donald S. Chisum, Chisum on Patents § 16.02[2] (2004).

35 U.S.C. Section 271(b) states: "Whoever actively [*14] induces infringement of a patent shall be liable as an infringer." Id. (2000). Liability under Section 271(b) is for indirect infringement. Moba, B.V. v. Diamond Automation, Inc., 325 F.3d 1306, 1318 (Fed. Cir. 2003). A plaintiff who claims the defendant infringed its patent by way of inducement, as is a contention here, must first demonstrate a predicate act of direct infringement by either a single entity or by separate entities with some connection to each other. See Faroudja, 1999 WL 111788 at *5. Unlike in direct infringement, moreover, the plaintiff must show that the defendant knowingly and intentionally induced infringement. MercExchange, LLC v. eBay, Inc., 401 F.3d 1323, 1332 (Fed. Cir. 2005).

AI's theory of liability against VTB is not crystal clear, but I interpret AI to assert that all the steps of the disputed claims are performed by either VTB or its customers, and the requisite connection between them is that VTB induced its customers to act. AI therefore turns proof of Section 271(b) liability on its head: Whereas inducement requires a predicate act of direct infringement, here AI wishes to invoke inducement to [*15] establish direct infringement. AI does not cite, nor have I found, any persuasive authority that supports this theory. [2] On this motion, however, I need not reach that issue and conclude that AI is able to show there are triable issues on a theory of direct infringement under Section 271(a) alone.

> 2 One court found the defendant company to be a direct infringer when some steps of the disputed method claim were performed by or at the direction of its affiliate. See Free Standing Stuffer, Inc. v. Holly Dev. Co., 1974 U.S. Dist. LEXIS 11420, 187 U.S.P.Q. 323, 333 (N.D. Ill. 1974). The court then concluded in a brief paragraph that even if the defendant could not be held liable for the acts of other entities, it would be liable for having actively induced infringement under Section 271(b). See id. The court did not address, however, whether inducement could be invoked to establish the predicate act of direct infringement required under Section 271(b).

[HN8]Cases appear to suggest the proposition [*16] that direct infringement may be sustained when a method claim is performed by connected entities and particularly where the patent contemplates action by at least two actors. Marley Mouldings is apposite. There, defendant Mikron purchased pellets from a third party, North Wood, that were made using the first step of the plaintiff's patented process. Id., 2003 WL 1989640 at *3. Mikron then practiced the remaining steps of the patent itself to form the pellets into a final product. Id. The pellets were "made to order" by North Wood based on certain specifications from Mikron, although the parties disputed whether Mikron dictated only the ingredients to be used or the process itself. Id. The court denied Mikron's summary judgment motion of non-infringement because there was "some connection" between Mikron and North Wood, and issues of fact as to the extent of Mikron's involvement in North Wood's pellet production. Id.

Here too there is "some connection" between VTB and its customers: If the customers accept VTB's invitations to print a coupon that entitles the "customer" to a free tour of the VTB factory, to search for products, or to become "PreFUR'd" [*17] members and be entered in a

sweepstakes, they must do so according to the instructions on VTB's web site. For example, the factory tour coupon appears on a web page together with the instructions to "*Print this coupon* and bring it with you for a free tour of our factory!" See Coupon, Ex. 1 to Qualey Decl. (underlining in original denotes a hyperlink). VTB's customers act in accordance with these instructions when they print the coupon and take it to VTB's factory to be redeemed for a free tour. Moreover, VTB performs more than a single step of the disputed claims and completes the methods itself, as I discuss later. *See infra* Sections IV.B.1, IV.B.2, IV.C.

Having concluded that VTB may, at least at this stage of the litigation, be liable for direct infringement when customers with whom VTB has "some connection" perform certain steps of the disputed claims, I proceed to examine whether either VTB or its customers indeed perform actions that infringe the patents-in-suit.

**B. Literal Infringement**

[HN9]The first step of a literal infringement analysis is to construe the meaning and scope of the patent claims asserted to be infringed. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) [*18] *en banc, aff'd*, 517 U.S. 370, 134 L. Ed. 2d 577, 116 S. Ct. 1384 (1996). The second step is to compare the properly construed claims to the products accused of infringing. *Id.* [HN10]Claim construction is a matter of law; but infringement is a question of fact. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384, 134 L. Ed. 2d 577, 116 S. Ct. 1384 (1996).

[HN11]Claim construction begins with the language of the claim itself, which is to be read and understood as it would be by a person of ordinary skill in the art at the time of the invention. *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004). In construing the claims, the court must at least in the first instance examine the intrinsic evidence (e.g., the patent, its claims, the specification, and file history) and then, if necessary, extrinsic evidence (e.g., expert reports, testimony, and anything else). *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1309 (Fed. Cir. 1999). [HN12]Generally, the terms in a claim should be given their ordinary and accustomed meaning. *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1362 (Fed. Cir. 1999). Dictionaries, [*19] encyclopedias, and treatises are "particularly useful . . . to assist the court in determining the ordinary and customary meanings of claim terms." *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1202 (Fed. Cir. 2002). The definition of a claim term may be altered from its ordinary and accustomed meaning, however, if "clearly and deliberately" set forth in the intrinsic evidence, such as the written description and prosecution history. *K-2 Corp.*, 191 F.3d at 1363.

[HN13]To establish literal infringement, every limitation set forth in a patent claim must be found in an accused product or process exactly or by a substantial equivalent. *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991). When the claim at issue involves a method or process, infringement does not occur unless all steps or stages of the claimed method are performed. *NTP, Inc. v. Research in Motion, Ltd.*, No. 03-1615, 418 F.3d 1282, 2005 U.S. App. LEXIS 15920, at *93 (Fed. Cir. Aug. 2, 2005).

**1. *The '874 Patent***

The parties first focus on Step 2 of Claim 10 of the '874 patent. This step, and the following step to which it is linked, [*20] read:

> providing said individuals with electronically programmable token dispensers capable,
>
> upon the request of individual ones of said individuals, of dispensing a token having value to said requesting individual, said value being available upon the performance of said act and upon surrender of said token,

VTB construes the term "electronically programmable token dispensers" to refer to an article of hardware for printing a hard copy record such as a coupon. See Defendant's Local Rule 56.1 Statement of Undisputed Facts ("Def. 56.1") P 4; Def. Mem. at 11. VTB maintains that it has never provided its customers with electronically programmable token dispensers. See 06/17/05 Declaration of Elisabeth B. Robert, President and Chief Executive Officer of The Vermont Teddy Bear Co., Inc. ("Robert Decl.") PP 3-4. Further, VTB asserts that it had no involvement with its prospective customers when they obtained token dispensers. See Def. Mem. at 13.

AI accepts VTB's construction of "electronically programmable token dispensers" for purposes of this motion for summary judgment of non-infringement. See Plaintiff's Local Rule 56.1 Statement of Undisputed Facts ("Pl. [*21] 56.1") P 4. AI contends, however, that nothing in the claim language requires that VTB provide the token dispensers to its customers. See Pl. Opp'n at 7. To the contrary, AI asserts that the genuine issue of fact is that VTB had a direct connection to each and every prospective customer, and that VTB's promotion of an online coupon for a free factory tour induced its web site

visitors to provide their own computers and printers to print the coupon in question. *See* Pl. Opp'n at 6-9.

The parties' dispute hinges on the meaning of the term "providing." Unfortunately, neither party offers a construction of this term, but it appears that VTB interprets "providing" narrowly to mean "supplying newly-acquired [equipment]," that is, that customers "provide" equipment when they purchase or obtain computers and printers they did not previously possess, or to which they did not previously have access. To the contrary, AI reads the term broadly to mean "making available already-acquired [equipment]," that is, that customers "provide" equipment when they make use of computers and printers they already own, or to which they already have access. [HN14]Because the '874 patent does not explicitly [*22] define the meaning of the term "providing," and neither party argues that the term has an established specialized meaning in technical dictionaries, encyclopedias, or treatises of the relevant field of art, a standard English dictionary is a proper resource to understand the ordinary and accustomed meaning of this term. The most closely applicable definition of "provide" in The Oxford English Dictionary is "to supply or furnish for use." *Id.* (2d ed. 1989). The American Heritage Dictionary offers the definitions "to furnish; supply" or "to make available." *Id.* (4th ed. 2000). Neither dictionary requires that the thing supplied, furnished, or made available be newly acquired. Therefore, for purposes of this motion, I construe the term "providing" to mean "furnishing, supplying, or making available already-existing [equipment]." Nothing in the specification of the '874 patent contradicts this construction. This construction supports AI's argument that Step 2 of Claim 10 of the '874 patent is satisfied by VTB's customers supplying or making available their already-acquired computer systems and printers to print VTB's factory tour coupon.

The remaining issue as to Step 2 is to [*23] determine whether VTB may be held responsible for infringement because its customers furnished computers and printers to print the coupon. As I previously concluded, VTB may be held liable for direct infringement if it has "some connection" to its customers. *See supra* Section IV.A. AI has shown that VTB invites its web site visitors to print out the coupon, bring it to its factory, and receive a free tour. *See* Coupon, Ex. 1 to Qualey Decl. While tenuous in my view, AI has raised a genuine issue of material fact when it contends that VTB and its customers are directly connected through the Internet, and that customers who accept VTB's offer obtain the free factory tour by following VTB's instructions to print out the coupon and redeem it at VTB's factory. Moreover, there is no question that VTB is the "organizer" that will perform the final step in Claim 10 of evaluating the effect of the coupon offer on consumers.

The parties next dispute Step 4 of Claim 10. This step reads:

> programming said dispensers by means of electronic instructional signals transmitted from a central location, said programming including value information to be borne by said token, said step of [*24] programming occurring subsequent to exposure of individuals to said stimulus, and prior to an individual requesting the dispensing of a token through entry of a command in said dispenser,

VTB argues that it does not program "dispensers" i.e. customers' printers, and that there is no programming "subsequent to exposure of the individuals to said stimulus." *See* Defendant's Reply in Further Support of its Motion for Summary Judgment ("Def. Reply") at 4. AI asserts that when VTB's customers select the hyperlink "*Print this coupon*" using their Internet browsers, they activate a "javascript:window.print()" function and cause the browsers' printing functions to activate and print the factory tour coupon. *See* Pl. Opp'n at 6; Print-out of Javascript Commands for Coupon Web Page ("Javascript"), Ex. 3 to Qualey Decl.

Neither the '874 patent nor the parties explicitly define the term "programming." The Academic Press Dictionary of Science and Technology defines "programming" as "a general term for the process of designing, coding, and testing programs for carrying out operations on a computer." *Id.* (1992). The dictionary definition is adopted and the term "programming" means [*25] "the process of designing, coding, and testing programs for carrying out operations on a computer." Nothing in the specification of the '874 patent contradicts this construction.

VTB's coupon web page contains javascript commands that direct the customer's web browser to start the customer's printer, call an external javascript file on the internet, and close the customer's browser window. *See* Javascript, Ex. 3 to Qualey Decl. The javascript print command, a code that instructs the customer's browser to send the coupon to the customer's printer, falls within the term "programming." By transmitting the javascript commands to its customer's computer from its servers, VTB programs the customer's printer "by means of electronic instructional signals transmitted from a central location." The javascript instructs the customer's web browser to display a coupon stating that the factory tour is free, thus fulfilling the claim requirement that the programming include value information to be borne by the token. *See id.* Next, Step 4 requires the programming to

occur after the customer is exposed to the "stimulus," i.e. VTB's coupon offer, and before the customer prints the coupon. AI [*26] asserts that the required sequence is met because there are two web pages involved: the first displays a link to the coupon, and the second displays the coupon itself. *See* 08/30/05 Transcript of Oral Argument on Summary Judgment of NonInfringement ("Tr.") at 18. AI contends that the first web page displaying the link is the "stimulus." *Id.* Consequently, the coupon web page containing the javascript commands is transmitted after customers are exposed to the first web page and before they print the coupon. *Id.* AI has produced evidence of the two web pages as described. *See* Coupon, Ex. 1 to Qualey Decl.; Product Search 1, Ex. 4 to Qualey Decl.; Print-out of Second Product Search Web Page ("Product Search 2"), Ex. 5 to Qualey Decl. Although AI has submitted no evidence of the order in which the pages are displayed, it can be inferred that the coupon web page is displayed after the customer views the web page that displays the link to the coupon and clicks on the link. Therefore, AI has raised genuine issues of material fact that VTB programs its customers' printers as set forth in Step 4.

AI has raised triable issues that two steps of Claim 10 are performed by either VTB [*27] or by customers with whom VTB has "some connection." Accordingly, VTB's motion for summary judgment of non-infringement of the '874 patent must be denied.

### 2. The '044 Patent

The parties dispute the first step of Claim 25 of the '044 patent. This step reads:

> providing a system at a remote location for recording product information signals conveyed over a telephone line and, for displaying the signals on a television at the remote location;

VTB construes the terms "system" and "television" to refer to "mechanical articles of hardware that are designed to record signals and subsequently display the signals." *See* Def. 56.1 P10. VTB asserts that it has never provided its customers with such hardware, nor was it involved when its prospective customers obtained such hardware. *See* Robert Decl. P 5; Def. Mem. at 15.

AI accepts VTB's construction for purposes of this motion. *See* Pl. 56.1 P 10. Nonetheless, AI argues that a computer falls within VTB's construction of "system," that VTB has a direct relationship with its web site visitors, and that VTB's product search functionality induces its customers to provide or obtain access to [*28] a computer system to search for products on VTB's web site. *See* Pl. Opp'n at 11-12.

The parties' arguments mirror those relating to Step 2 of Claim 10 of the '874 patent, and for the same reasons discussed above, AI has raised genuine issues of material fact that VTB had "some connection" to its customers when they supplied or made available their computer systems to search for products on VTB's web site. *See supra* Sections IV.A, IV.B.1. Here, VTB's product search web page displays a "Search For" text box and a "Go" button. *See* Product Search 1, Ex. 4 to Qualey Decl.; Product Search 2, Ex. 5 to Qualey Decl. VTB's customers act within the search parameters set by VTB when they use these functions to send product queries to VTB's servers and receive product information on their computer screens. Moreover, VTB performs the third step of Claim 25 by transmitting product information signals in response to its customers' queries, and the final step of the claim--that of recording and displaying the signals--is an electronic consequence of VTB's performance of the third step.

While I consider the dispute over Step 1 of Claim 25 a close question, I conclude that AI has raised [*29] genuine issues of material fact to the effect that VTB had "some connection" to their customers when the customers provided their computer systems to record and display VTB's product information signals, thus performing Step 1 of Claim 25 of the '044 patent, VTB's motion for summary judgment of non-infringement of the '044 patent is denied.

### 3. The '795 Patent

VTB points out that Claim 26 of the '795 patent recites the term "player's wager entry" five times with an additional recitation of "player's stored wager entry." *See* Def. Mem. at 19. Based on the specification of the '795 patent, VTB contends that Claim 26 requires some form of wagering, which VTB defines as "risk taking" or "paying for one's wagers." *See id.* at 19-20. VTB avers that it has never conducted any business, game of skill, lottery, sweepstakes, or contests in which its customers were required to make a wager or pay VTB a wager. *See* Robert Decl. PP 12-15.

AI disagrees with VTB's definition of "wager" to the extent that it means risking a monetary amount. *See* Pl. Opp'n at 20. Instead, AI alleges that "wager" requires only that customers give VTB something of value. [*30] *See* Pl. Opp'n at 21-22. AI argues that personal information is something of value, and that VTB requires customers to give it their personal information in exchange for signing up to be a "PreFUR'd" member and being entered in VTB's sweepstakes for a chance to win a free teddy bear. *See id.* at 22. Thus, AI concludes, customers

"risk" their personal information for a chance to win a teddy bear. *See id.*

Regardless of whether customer personal information is of value to VTB, AI fails to show how VTB's customers "take a risk" when they give their personal information to VTB. AI contends that the "risk" is that customers do not win a free bear, but VTB would still have their e-mail addresses and will send them e-mails about "bears and pajamas and food." *See Tr.* at 20; Marketing E-Mails from VTB and its Subsidiaries ("Marketing E-Mails"), Ex. A to 07/01/05 Declaration of Jaime A. Siegel, President and Chief Executive Officer of AI ("Siegel Decl."). This is not the type of "risk" contemplated in wagering, which involves losing what one has staked. Here, customers do not "lose" their personal information. Indeed, to the extent that they receive product information [*31] in exchange for supplying their personal information, they could be said to have gained payment in kind. In any event, VTB requires its customers to opt-in to receive marketing e-mails by clicking on designated checkboxes when they sign up to be "PreFUR'd" members. *See* Print-out of PreFUR'd Member Sign-Up Web Page ("Member Sign-Up"), Ex. 7 to Qualey Decl. Consequently, VTB's customers can avoid the "risk" of being deluged with unwanted e-mails by simply refraining from opting-in.

Further, as VTB rightly points out, Claim 26 by its own terms refutes AI's contention that customers engage in wagering when they supply VTB with their personal information. Step 6 of Claim 26 recites:

> storing an identification of a player and the player's wager entry indicium at a tamper-resisting storage facility . . .

The language of this step treats "an identification of a player" and "the player's wager entry indicium" as two separate things. Therefore, the claim itself rejects the notion that a customer's personal information constitutes a wager.

AI has failed to raise genuine issues of material fact that VTB requires its customers to engage in wagering. Accordingly, VTB's motion [*32] for summary judgment of noninfringement of the '795 patent is granted.

### C. *Claim 62 of the '731 Patent and Literal Infringement of Means-Plus-Function Claims*

[HN15]A means-plus-function claim is one "expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof." 35 U.S.C. § 112, P 6 (2000). To construe a means-plus-function limitation, the court first identifies the function of that limitation, then identifies the corresponding structure(s) in the specification necessary to perform that function. *Micro Chem., Inc. v. Great Plains Chem., Co.,* 194 F.3d 1250, 1258 (Fed. Cir. 1999). [HN16]Infringement of a means-plus-function limitation occurs when an accused device performs the identical function specified in the means clause and is insubstantially different from the corresponding structure. *Id. at 1536.* As stated in *Valmont Industries, Inc. v. Reinke Manufacturing Co., Inc.,* 983 F.2d 1039, 1042 (Fed Cir. 1993):

> In sum, for a means-plus-function limitation to read on an accused device, the accused device must employ means identical to [*33] or equivalent of the structures, material, or acts described in the patent specification. The accused device must also perform the identical function as specified in the claims.

Step 5 of Claim 62 of the '731 patent is drafted in a means-plus-function format:

> providing means for communicating response data from the locations of responding members to a central data storage facility;

VTB identifies the function of this limitation as "communicating response data from the locations of responding members to a central data storage facility." Among the structures VTB identifies as corresponding to the claimed means are the following:

> The equipment of standard broadcast technology, telephone, or fiber optic communication links, or communication via satellite, the latter being employed in a preferred embodiment of the invention.

'731 patent, Col. 102, lines 4-8. Based on this, and other descriptions in the specification, VTB defines the means to be "a mechanical article of hardware designed to facilitate communications." *See* Def. 56.3 Utah 54, 1 P 15. VTB maintains that it has never provided its customers with any sort of equipment to facilitate communications [*34] between its customers and Vermont. *See* Robert Decl. PP 6-8.

AI disagrees that the means is limited to hardware. Instead, AI identifies the following as a structure that also corresponds to the claimed means:

> [A response unit with] a touch panel in which keys of the keyboard . . . are provided directly on the screen of the display
> . . .

'731 patent, Col. 107, lines 5-7. Based on this description, AI contends that the claimed means includes software and/or hardware, and that this element is met by VTB's provision of a "sign up" button on its website that is selected by a customer to send response data to VTB's central server. See Pl. 56.3 Utah 54, ¶ P 15; Pl. Opp'n at 15. Alternatively, AI argues that even under VTB's construction, VTB itself or through an agent leases, owns, or otherwise provides hardware in the form of an Internet connection for the operation of its web site which facilitates communication over the Internet between responding customers and a central data storage facility operated by or on behalf of VTB. See Pl. 56.1 P 16. AI asserts that the hardware of VTB's Internet connection, together with the hardware of its customers' [*35] Internet connections, which VTB has induced its customers to provide, together comprise the claimed means. See Pl. Opp'n at 16-17.

I need not resolve whether the means encompasses just hardware or both software and hardware because I find that under VTB's construction, AI has raised triable issues that VTB and its customers together provide a means for communicating response data. It is indisputable that VTB has connected the servers housing its web site to the Internet. AI has demonstrated this by submitting print-outs of VTB's web pages downloaded from the Internet. See Coupon, Ex. 1 to Qualey Decl.; Product Search 1, Ex. 4 to Qualey Decl.; Product Search 2, Ex. 5 to Qualey Decl.; Membership Invitation, Ex. 6 to Qualey Decl.; Member Sign-Up, Ex. 7 to Qualey Decl. Further, under my analyses in Sections IV.A and IV.B.1 above, VTB can be held responsible for its customers providing their Internet connections to access VTB's web site because there is "some connection" between VTB and its customers. Here, VTB's customers provide their Internet connections to respond to VTB's online invitations to search for products, sign up as members, and so forth. Moreover, VTB itself would [*36] perform multiple steps of the claim, including the final step of informing winning members of the result of the sweepstakes. AI has also produced evidence that VTB's Internet connection, together with a customer's Internet connection, performs the function of communicating response data to VTB's central data storage facility. This evidence, marketing e-mails VTB sent to Jaime Siegel, AI's President and Chief Executive Officer, demonstrates that Mr. Siegel's online response to VTB's invitation to sign up as a "PreFUR'd" member was communicated to VTB. See Siegel Decl. PP 3-5; Marketing EMails, Ex. A to Siegel Decl. The hardware of Internet connections is identical to the corresponding structures of "the equipment of standard broadcast technology, telephone, or fiber optic communication links, or communication via satellite" in that the Internet is comprised of all these structures. See The Internet, at *http://en.wikipedia.org/wiki/Internet* (last updated Sept. 6, 2005) ("Any communications network, wired or wireless, that can carry two-way digital data can carry Internet traffic. Thus, Internet packets flow through wired networks like copper wire, coaxial cable, and fiber [*37] optic; and through wireless networks like Wi-Fi. Together, all these networks, sharing the same high-level protocols, form the Internet.").

Because a jury could find that VTB and its customers provide means for communicating response data from the locations of responding members to a central data storage facility, as set forth in Step 5 of Claim 62 of the '731 patent, VTB's motion for summary judgment of non-infringement of the '731 patent is denied.

## V. CONCLUSION

For the reasons set forth above, VTB's motion for summary judgment of non-infringement of the '874, '044, and '731 patents is denied. VTB's motion for summary judgment of non-infringement of the '795 patent is granted. As previously set at oral argument, trial will begin on February 6, 2006. The parties may submit fully briefed dispositive motions on or before November 28, 2005.

**IT IS SO ORDERED.**

**New York, New York**

**September 6, 2005**

HAROLD BAER, JR.,

U.S.D.J.