SPENCER HOSIE (CA Bar No. 101777)
shosie@hosielaw.com
BRUCE WECKER (CA Bar No. 078530)
bwecker@hosielaw.com
GEORGE BISHOP (CA Bar No. 89205)
gbishop@hosielaw.com
HOSIE McARTHUR LLP
One Market, 22nd Floor
San Francisco, CA 94105
(415) 247-6000 Tel.
(415) 247-6001 Fax

ROBERT J. YORIO (CA Bar No. 93178)
CARR & FERRELL LLP
2200 Geng Road
Palo Alto, CA 94303
(650) 812-3400 Tel.
(650) 812-3444 Fax

Attorneys for Plaintiff
PRIVASYS, INC.

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
(SAN FRANCISCO)

PRIVASYS, INC,

Plaintiff,

v.

VISA INTERNATIONAL SERVICE ASSOCIATION, VISA U.S.A., JPMORGAN CHASE & CO., CHASE BANK, N.A., Chase Bank, USA, N.A., WELLS FARGO & COMPANY and WELLS FARGO BANK, N.A.

Defendants.

Case No. C 07-03257 SI

**AMENDED COMPLAINT AND**

**DEMAND FOR JURY TRIAL**

Plaintiff PrivaSys, Inc. ("PrivaSys" or "Plaintiff") hereby brings its amended complaint against Defendants Visa International Service Association and Visa, U.S.A. ("Visa"), JPMorgan Chase & Co., Chase Bank, N.A. and Chase Bank, USA, N.A. ("Chase"), and Wells Fargo & Company and Wells Fargo Bank, N.A ("Wells Fargo") (collectively "Defendants") for patent infringement. For its complaint, PrivaSys hereby alleges on personal knowledge as to its own acts, and on information and belief as to all other matters as follows:

## INTRODUCTION

1. As alleged more fully below, the Visa payWave payment cards and devices, created by Visa and issued by Visa member banks including Chase and Wells Fargo, infringe PrivaSys' U.S. Patent No. 7,195,154 ("'154 patent"). PrivaSys' patent discloses the security technology that is essential for the success of the Visa payWave "contactless" card. The payWave devices, employing radio frequency or similar contactless communication between device and reader, give consumers the convenience of completing a transaction without "swiping" a card through a magnetic stripe reader, but also create new risks of fraud because, *e.g.*, a radio signal carrying account information can be intercepted and the information stolen. PrivaSys' patent discloses a means to securely authenticate contactless transactions and protect against fraud, which defendants have used without licensing PrivaSys' patent. Several of Visa's principal competitors, including MasterCard and transaction processor First Data, Inc., have licensed PrivaSys' patent and technology. In light of MasterCard's license, this complaint does not allege infringement based upon use by Chase or Wells Fargo of MasterCard's PayPass features.

**PARTIES**

2. PrivaSys is a Delaware corporation, with its principal place of business in Newbury Park, California. PrivaSys is the assignee of the patent at issue in this case.

3. Defendants Visa U.S.A. and Visa International Service Association ("Visa International") are organized under the laws of the State of Delaware, and each has its principal place of business in Foster City, California. Visa U.S.A. and Visa International are associations of independent banks and financial institutions and are structured as membership corporations. Although Visa International has delegated certain authority to regional boards, including the Board of Directors of Visa U.S.A., Visa International retains ultimate authority over the policies and practices of Visa U.S.A., even for matters solely within the United States. Visa U.S.A., Visa International, and all of their respective predecessors and subsidiaries are referred to collectively herein as "Visa." Visa's member banks and financial institutions own Visa. They are also Visa's primary customers, and are permitted to issue Visa devices and otherwise participate in the Visa payment network. The members, including Chase and Wells Fargo, agree to abide by the operating regulations and rules of Visa. Accordingly, the members are required by Visa to comply with Visa's rules and standards for its product platforms and payments network, including design, features and functionality of payment cards and programs. Visa licenses its patents to its members on the same terms and conditions.

4. Defendants JPMorgan Chase & Co. and Chase Bank, N.A. are corporations organized under the laws of the State of Delaware, and each has its principal place of business in New York, New York. Chase Bank, USA, N.A., is a corporation organized under the laws of the State of Delaware, with its principal place of business in Wilmington, Delaware. Chase is a member, *i.e.*, owner, of Visa. Chase is one of the

nation's largest issuers of Visa and other payment cards, with more than 154 million credit cards in circulation and more than $339 billion worth of transactions in 2006.

5. Defendants Wells Fargo & Company and Wells Fargo Bank, N.A. are corporations with their principal place of business in San Francisco, and are organized under the laws of the State of Delaware. Wells Fargo is a member of Visa. Wells Fargo is a major issuer of Visa payment cards.

## JURISDICTION AND VENUE

6. This complaint asserts a cause of action for patent infringement under the Patent Act, 35 U.S.C. § 271. This Court has subject matter jurisdiction over this matter by virtue of 28 U.S.C. § 1338(a). Venue is proper in this Court by virtue of 28 U.S.C. § 1391(b) and (c) and 28 U.S.C. § 1400(b).

7. This Court has personal jurisdiction and venue over Visa because it provides infringing products and services in the Northern District of California and Visa has a regular and established place of business in this district.

8. This Court has personal jurisdiction and venue over Chase because it resides in the Northern District of California, and provides infringing products and services in this district and has a regular and established place of business in this district.

9. This Court has personal jurisdiction and venue over Wells Fargo because it resides in the Northern District of California, and provides infringing products and services in this district and has a regular and established place of business in this district.

## INTRADISTRICT ASSIGNMENT

10. Pursuant to Civil LR 3-2(c), this case should be subject to district-wide assignment because it is an Intellectual Property Action.

## BACKGROUND

### The Pervasive Payment Card Fraud Problem

11. For the past 40 years, payment cards have been inanimate pieces of plastic. Each card has a primary account number in embossed characters, information about the cardholder also embossed, an encoded magnetic stripe ("magstripe") on the back of the card, and a printed and visible three or four digit security code.

12. The magstripe contains data that can be read by magstripe readers, the terminals used by merchants at the point of sale ("POS"). When a merchant swipes a card, a magnetic head reads the encoded data and then transmits the data to the issuing bank with an authorization request. "Track 1" data on the magstripe typically contains the customer's name, account number, expiration date, and a "discretionary data" field to be used by the issuing bank. "Track 2" data contains the account number, expiration date, and another "discretionary data" field, all of which must fit within approximately 40 digits of space.

13. A person who obtains the Track 1 and Track 2 account information and the printed security code has all the information that he needs to manufacture a counterfeit card. An increasing form of fraud consists of collecting valid account numbers, either through "skimming" (*e.g.*, collecting card numbers electronically) or through data compromise (e.g., computer hacking) and then using the account numbers and printed security code to manufacture counterfeit cards. Payment card fraud using such techniques costs the issuing banks – and ultimately the cardholders – many billions of dollars a year.

14. Payment card fraud is being addressed in Europe and in Asia, in part, through the adoption of "smart cards." A smart card is a payment card equipped with a

secure chip, possessing internal data processing functionality. Smart cards are more difficult to duplicate than conventional cards, and they have intrinsic security protection. In Europe, MasterCard and Visa have advanced smart cards through a joint venture known as EMVCo. ("EMV").

15. While smart cards offer many benefits, they cannot be read by conventional magstripe POS terminal readers. Instead, smart cards require new, more sophisticated terminals. In essence, full smart card adoption requires wholesale replacement of the existing POS magstripe terminals. This "re-terminalization" is expensive but essential to widespread smart card adoption.

16. MasterCard and Visa accelerated smart card adoption in Europe through what is known as "liability shift." In the United States, a POS merchant is not liable for loss when a fraudulent card is used in a "card present" transaction, so long as he properly obtains a "personal identification number" ("PIN") or a signature and obtains issuer authorization. Instead, the issuing bank absorbs that loss. Conversely, in countries that mandate the issuing banks release smart cards, a POS merchant in Europe bears the fraud loss unless he has invested in a smart card terminal, even if he innocently accepts a fraudulent card. Shifting the fraud loss to the merchant gives the merchant a strong incentive to invest in new smart card terminals.

17. MasterCard and Visa have been unable to introduce smart cards in the United States. In considerable part, this is due to the enormous cost of re-terminalization, estimated to be in the vicinity of $12-13 billion. Because MasterCard and Visa have been unable to shift the fraud loss to POS merchants, those merchants lack the economic incentive to invest in new smart card terminals and have generally declined to do so.

18. Visa and MasterCard studied the business case for smart cards. Visa and MasterCard concluded that widespread smart card adoption was not economically warranted in the United States, given the cost of re-terminalization, merchant resistance, and the expensive changes required in the issuing banks' back-office operations. Neither Visa nor MasterCard was able to break this technological logjam. As a result, the American payment card market did not respond to increasing multibillion-dollar skimming fraud through the widespread adoption of smart cards.

**PrivaSys' Solution To Payment Card Fraud**

19. PrivaSys was founded to develop innovative ways to reduce payment card fraud while working within the existing legacy system of magstripe readers and transaction networks. PrivaSys understood that smart cards would be adopted slowly if at all in this country, which gave rise to a compelling need to make the legacy system itself more secure. Prior security approaches, *e.g.*, card holograms or printed security codes, were easily circumvented, as they were static and unchanging. Thus, PrivaSys invented a new approach that would allow the card itself to become the center of innovation. Re-terminalization is unnecessary because data is received from the card in the traditional magnetic stripe data packet format.

20. The PrivaSys system creates an authentication code that is unique to each card and each transaction. The data are transmitted to the magstripe reader by a signal from the card. Because a counterfeit card lacks the ability to generate this unique code, or watermark, the issuing bank knows to reject the fraudulent transaction.

21. The PrivaSys method works as follows:

- Each card securely stores a card-specific, cryptographic key on a chip.

- Each card contains a "counter" that increments with every use or attempted use of the card.
- Each card contains a cryptographic algorithm, to calculate an authentication code.
- The information is processed through a triple-DES (or 3DES) encryption algorithm. The output of this algorithm is reduced to several digits unique to the specific transaction for the given card.
- These digits are referred to as a "dynamic authentication code" (or DAC). The DAC is placed in the discretionary data field of Track 1 and/or Track 2. The DAC is then communicated along with the account number, expiration date and a request for authorization to the issuing bank, all through the existing legacy infrastructure.
- The issuing bank has backend software that reproduces the DAC computation on a per-card, per-transaction basis. When the issuing bank receives an authorization request and accompanying DAC, it computes its own DAC for that card using that card's specific cryptographic key. It then compares its issuer-generated DAC to the card-generated DAC, and approves the transaction if the two match, and the other account information appears proper.

A counterfeit card does not have the ability to create the unique, transaction-specific DAC. In this way, the PrivaSys method detects the use of counterfeit cards and denies any transaction attempted, and does so within the existing magstripe legacy system.

22. PrivaSys' fraud prevention technology is not, however, limited to the legacy magstripe reader system. PrivaSys designed it to be adaptable to a variety of communications systems and transmission means– including radio frequency (RF), mobile (cellular wireless), IR (infrared) and broadcasted magnetic stripe systems.

23. PrivaSys' technology is designed to bridge the gap between traditional credit cards and fully EMV-compliant smart cards. Because it does not require full re-terminalization, PrivaSys reasonably believed that its technology would be adopted quickly, populating the United States market with intelligent cards and payment devices. This would facilitate the ultimate transition to smart cards.

**The PrivaSys Patent**

24. Plaintiff owns a patent, U.S. Patent No. 7,195,154 ("'154"), issued on March 27, 2007, to inventor Larry Routhenstein covering PrivaSys' methods for providing secure transactions between a money source (such as a Visa issuing bank) and its customer credit or debit card holders. A true and correct copy of the '154 Patent is attached as Exhibit "A." Plaintiff is the legal and rightful owner of the Routhenstein Patent.

25. The '154 Patent contains thirty-five (35) patent claims covering a unique and novel method for generating and validating a dynamic code with each transaction transmitted over the existing payment card networks. In general, the patent discloses a method that uses an encrypted and compressed authentication code that is dynamically calculated with each transaction and transmitted via the discretionary data field through the legacy payment card processing system and which was validated by duplicating the calculation in the issuing bank's data processing systems and comparing two values for a match.

26. PrivaSys has licensed this technology to a number of Visa's principal competitors in contactless payment card and transaction processing businesses, including MasterCard and transaction processor First Data, Inc. Visa, however, has refused to take a license for its payWave products. Visa's member banks, including Chase and Wells Fargo, are required to conform to Visa's rules and specifications when issuing payWave cards.

**Visa's Infringing Services**

27. Plaintiff's patent application was publicly known as early as March 27, 2003, when the application was published by the Patent Office. On the issuance of the

patent, Visa became aware of it through ongoing licensing discussions among counsel. Despite this knowledge, Visa has proceeded on a path of selling infringing products and services as detailed below.

28. Recently, Visa began to offer contactless cards or devices, *i.e.*, payment cards that do not need to be swiped through a magnetic reader, called variously "Visa Contactless," "Visa Wave," and Visa "payWave." These devices are referred to herein as "payWave" or "contactless devices." These Visa contactless devices contain a small computer chip and a radio-frequency antenna (RF) that allows a reader to receive data from the device when it is placed in proximity to the reader (typically within a few centimeters). Visa's contactless devices are designed to send standardized magnetic stripe Track 1 or Track 2 data streams, *i.e.*, data is packaged as per the existing magnetic stripe legacy system protocols.

29. Visa's contactless payment protocols operate as follows: (1) there is a unique cryptographic key for each Visa payment device, be it a FOB or credit card; (2) the device generates a unique several digit cryptogram for each and every card-specific transaction; Visa refers to this unique cryptogram, or watermark, as the dynamic Card Verification Value or "dCVV". The dCVV is packaged as per existing magnetic stripe data protocols and sent in the discretionary data field through the existing legacy system; (3) Visa provides the specifications for the de-encryption engine for dCVV de-encryption to the issuing banks, those banks maintain a backend de-encryption engine as specified by Visa, which replicates the dCVV calculation for each card-specific use, and approves the transaction if the dCVVs match and the other account data appear proper.

30. The use of a dynamic cryptogram is essential to the success of the payWave product. Absent such a cryptogram, the RF transactions could be easily skimmed or breached, and fraud would proliferate.

**Chase's Infringing Services**

31. Chase is one of the nation's largest issuers of Visa payWave devices. Chase issues under the name "blink" Visa payWave contactless cards or devices that incorporate the payWave features and technology ("blink" or "contactless devices"), called, *e.g.*, "Chase blink," "Chase cards with blink," "Chase flexible rewards card with blink," and "Chase Platinum Visa Business card with blink." Chase had issued approximately six million blink cards by the end of 2006. Chase issues both credit and debit blink devices. In addition, Chase has participated in large-scale trials of payWave contactless devices in the form of mobile phones.

32. Chase's Visa-branded blink cards and devices conform to Visa payWave specifications and incorporate the payWave features and technology described above. Chase blink devices contain a small computer chip and a radio-frequency antenna (RF) that allows a reader to receive data from the device when it is placed in proximity to the reader (typically within a few centimeters). Chase's contactless devices are designed to send standardized magnetic stripe Track 1 or Track 2 data streams, *i.e.*, data is packaged as per the existing magnetic stripe legacy system protocols. Chase's contactless payment protocols operate as follows: (1) there is a unique cryptographic key for each payment device, be it a FOB or credit card; (2) the device generates a unique several digit cryptogram for each and every card-specific transaction; Visa refers to this unique cryptogram, or watermark, as the dynamic Card Verification Value or "dCVV." The dCVV is packaged as per existing magnetic stripe data protocols and sent in the

discretionary data field through the existing legacy system; (3) the de-encryption engine for dCVV, which replicates the dCVV calculation for each card-specific use, approves the transaction if the dCVVs match and the other account data appear proper. MasterCard-branded blink cards are not the subject of this complaint, inasmuch as MasterCard has licensed PrivaSys' patent.

33. The use of a dynamic cryptogram is essential to the success of the Chase Visa-branded contactless devices. Absent such a cryptogram, the RF transactions could be easily skimmed or breached, and fraud would proliferate.

34. In addition to issuing contactless devices, Chase processes payments for contactless devices including authenticating transactions by deciphering the dCVV.

**Wells Fargo's Infringing Services**

35. Wells Fargo is another major issuer of Visa payWave devices, called, *e.g.*, "Wells Fargo Visa credit card with Visa payWave," "Wells Fargo Check Card with Visa payWave," and "Visa payWave feature." Wells Fargo issues both credit and debit Visa payWave cards. In addition, Wells Fargo has participated in trials of contactless payment devices in the form of mobile phones incorporating Visa payWave.

36. Wells Fargo's payWave cards and devices conform to Visa payWave specifications and incorporate the payWave features and technology described above. Wells Fargo payWave devices contain a small computer chip and a radio-frequency antenna (RF) that allows a reader to receive data from the device when it is placed in proximity to the reader (typically within a few centimeters). Wells Fargo's payWave devices are designed to send standardized magnetic stripe Track 1 or Track 2 data streams, *i.e.*, data is packaged as per the existing magnetic stripe legacy system protocols. Wells Fargo's payWave payment protocols operate as follows: (1) there is a unique

cryptographic key for each payment device, be it a FOB or credit card; (2) the device generates a unique several digit cryptogram for each and every card-specific transaction; Visa refers to this unique cryptogram, or watermark, as the dynamic Card Verification Value or "dCVV." The dCVV is packaged as per existing magnetic stripe data protocols and sent in the discretionary data field through the existing legacy system; (3) the de-encryption engine for dCVV, which replicates the dCVV calculation for each card-specific use, approves the transaction if the dCVVs match and the other account data appear proper.

37. The use of a dynamic cryptogram is essential to the success of the Wells Fargo contactless devices. Absent such a cryptogram, the RF transactions could be easily skimmed or breached, and fraud would proliferate.

38. In addition to issuing contactless devices, Wells Fargo processes payments for contactless devices including authenticating transactions by deciphering the dCVV.

**COUNT I**
**(Patent Infringement against each defendant)**

39. Defendants have, without authority, consent, right or license, and in direct infringement of the Routhenstein Patent, made, used, offered for sale and/or sold products using the methods claimed in the patent in this country. This conduct constitutes infringement under 35 U.S.C. § 271(a).

40. In addition, Visa has in this country, through its promotion of Visa payWave (and similar brand names) and agreements with its issuing banks including Chase and Wells Fargo to distribute Visa payWave devices and to process transaction initiated from those devices, actively induced others to make, use, and/or sell the systems, products and methods claimed in one or more claims of the Routhenstein Patent. Chase

has in this country, through its issuance and promotion of Chase blink Visa payWave (and similar brand names excluding MasterCard-branded blink) and agreements with Visa as to its payWave devices, actively induced others to make, use, and/or sell the systems, products and methods claimed in one or more claims of the Routhenstein Patent. Wells Fargo has in this country, through its issuance and promotion of Wells Fargo payWave (and similar brand names) and agreements with Visa as to its payWave devices, actively induced others to make, use, and/or sell the systems, products and methods claimed in one or more claims of the Routhenstein Patent. This conduct constitutes infringement under 35 U.S.C. § 271(b).

41. Defendants' infringing conduct is unlawful and willful and will continue unless enjoined by this Court. Defendants' willful conduct makes this an exceptional case as provided in 35 U.S.C. § 285.

42. As a result of Defendants' infringement, Plaintiff has been damaged, and will continue to be damaged, until Defendants are enjoined from further acts of infringement.

43. Plaintiffs face real, substantial and irreparable damage and injury of a continuing nature from Defendants' infringement for which Plaintiff has no adequate remedy at law.

WHEREFORE, Plaintiff prays:

(a) That this Court find Defendants have committed acts of patent infringement under the Patent Act, 35 U.S.C. § 271;

(b) That this Court enter judgment that:

(i) the Routhenstein Patent is valid and enforceable and;

(ii) Defendants have willfully infringed the Routhenstein Patent;

(c) That this Court issue an injunction enjoining Defendants, their officers, agents, servants, employees and attorneys, and any other person in active concert or participation with them, from continuing the acts herein complained of, and more particularly, that Defendants and such other persons be permanently enjoined and restrained from further infringing the Routhenstein Patent;

(d) That this Court require Defendants to file with this Court, within thirty (30) days after entry of final judgment, a written statement under oath setting forth in detail the manner in which Defendants have complied with the injunction;

(e) That this Court award Plaintiff the damages to which it is entitled due to Defendants' patent infringement, with both pre-judgment and post-judgment interest;

(f) That Defendants' infringement of the Routhenstein Patent be adjudged willful and that the damages to Plaintiff be increased by three times the amount found or assessed pursuant to 35 U.S.C. § 284;

(g) That this be adjudged an exceptional case and that Plaintiff be awarded its attorney's fees in this action pursuant to 35 U.S.C. § 285;

(h) That this Court award Plaintiff its costs and disbursements in this civil action, including reasonable attorney's fees; and

(j) That this Court grant Plaintiff such other and further relief, in law or in equity, both general and special, to which it may be entitled.

**DEMAND FOR JURY TRIAL**

Plaintiff, by its undersigned attorneys, demands a trial by jury on all issues so triable.

Dated: September 28, 2007

Respectfully submitted,

/s/ Spencer Hosie

SPENCER HOSIE (CA Bar No. 101777)
shosie@hosielaw.com
BRUCE WECKER (CA Bar No. 078530)
bwecker@hosielaw.com
GEORGE BISHOP (CA Bar No. 89205)
gbishop@hosielaw.com
HOSIE McARTHUR LLP
One Market, 22nd Floor
San Francisco, CA 94105
(415) 247-6000 Tel.
(415) 247-6001 Fax

ROBERT J. YORIO (CA Bar No. 93178)
CARR & FERRELL LLP
2200 Geng Road
Palo Alto, CA 94303
(650) 812-3400 Tel.
(650) 812-3444 Fax

Attorneys for Plaintiff
PRIVASYS, INC.